**PATSY CROOM**

      **Plaintiff,**

**vs.**                    **CASE NO. 8:08-cv-1219-SCB-MAP**

**SHERIFF WILLIAM F. BALKWILL, in his official capacity; SCSO SERGEANT CLIFFORD LEGG, in his individual and official capacities; SCSO DETECTIVE FRANK BYBEE, in his individual and official capacities; and SCSO DEPUTY STEPHANIE GRAHAM, in her individual and official capacities,**

      **Defendants.**
_____/

*ORDER ON MOTION TO STRIKE AFFIDAVIT FILED IN SUPPORT TO MOTION FOR SUMMARY JUDGMENT, AND ON MOTIONS FOR SUMMARY JUDGMENT*

THE CAUSE is before the Court on three motions for summary judgment and incorporated memoranda in support filed by Defendants, William F. Balkwill ("Balkwill"), Frank Bybee ("Bybee"), Stephanie Graham ("Graham"), and Clifford Legg ("Legg") [Dkts. 22, 29, 31], and three memoranda in response then filed by Plaintiff, Patsy Croom. [Dkts. 50, 51, 52]. Defendant Graham filed a Motion for Partial Summary Judgment and Incorporated Memorandum of Law In Support. [Dkt. 29]. Defendant Graham also filed the Affidavit of Stephanie Graham. [Dkt. 34]. In response, Plaintiff filed a Memorandum of Law in Opposition to Defendant's Motion for Partial Summary Judgment and Motion to Strike

Defendant Graham's Affidavit Filed in Support of Defendant's Motion for Partial Summary Judgment [Dkt. 50], to which Defendant Graham in response filed an Opposition to Plaintiff's Motion to Strike. [Dkt. 59]. Defendants Balkwill and Bybee filed a Motion for Partial Summary Judgment and Incorporated Memorandum of Law In Support [Dkt. 22], to which Plaintiff in response filed Memoranda of Law in Opposition to Defendants' Motion for Partial Summary Judgment. [Dkts. 51, 52]. Defendant Legg filed a Motion for Summary Judgment and Incorporated Memorandum of Law In Support [Dkt. 31], to which Plaintiff in response filed a Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment. [Dkt. 52]. A review of the entire record, including motions, exhibits, and affidavits demonstrates that Defendants Graham, Legg, Balkwill, and Bybee's motions for summary judgment must be granted.

## STATEMENT OF THE CASE

Plaintiff originally filed a seventeen-count[1] complaint in the Circuit Court for the Twelfth Judicial Circuit, Sarasota County, Florida on June 2, 2008. [Dkt. 2]. Defendant Balkwill removed the case to this Court on June 25, 2008. [Dkt. 1]. Plaintiff alleges claims under 42 U.S.C. § 1983 against Sheriff Balkwill, in his official capacity, and Sergeant Legg, Detective Bybee, and Deputy Graham, in their individual and official capacities, for false arrest and excessive use of force. [Dkt. 2]. Plaintiff further alleges claims under Florida Statute § 768.28 against Sheriff Balkwill, in his official capacity, and Sergeant Legg, Detective Bybee, and Deputy Graham, in their individual and official capacities, for false

_____

[1] Plaintiff's complaint lists eighteen counts, however, there is not an eleventh count.

arrest and imprisonment, assault, and battery. *Id.* Plaintiff also alleges a claim under Florida

Statute § 768.28 against Sheriff Balkwill, in his official capacity, for negligence. *Id.*

## BACKGROUND

The facts, taken as true only for purposes of resolving the instant motions, reflect

the following. In June 2004, Defendant Bybee received information from a confidential

informant that three individuals, Mr. Edward Gable, Mr. Tashko Dinev, and Mr. Bryan

Flowers (Plaintiff's son), were selling ketamine[2] from two residences in Sarasota, Florida,

located at 1370 13th Street and 325 Ohio Place, No. 8. [Bybee Dep. P. 74-75, Ex 3].

Defendant Bybee retrieved their drivers' license information from the Department of

Highway Safety and Motor Vehicles, which confirmed that Flowers and Dinev resided at

1370 13th Street and Gable resided at 325 Ohio Place, No. 8. *Id.* at Ex. 3. The informant

further related to Defendant Bybee that the ketamine was being shipped to Gable, Dinev, and

Flowers from Bulgaria. *Id.*

From July through August 2004, Defendant Bybee conducted drive-by

surveillance on the residences on at least twenty (20) occasions, which consisted of observing

the houses, noting whether or not there was any activity, and recording the license plates of

vehicles parked on the property. *Id.* at 79-81. On July 18, 2004, Defendant Bybee visited

325 Ohio Place, No. 8 and discovered ten ketamine bottles discarded outside the door of the

apartment in a public access "common area." *Id.* at 75, Ex. 3. Defendant Bybee seized the

---

[2] Ketamine is "commonly referred to as the date-rape drug." [Bybee Dep. P. 59-60]. Possession of
ketamine is a third degree felony under Florida Statute § 893.13(1)(a)2.

bottles and notified the United States Postal Service that any packages addressed to either 325 Ohio Place, No. 8 or 1370 13th Street, Sarasota from Bulgaria should be detained for evaluation by U.S. Customs.  *Id*. at 76, Ex. 3.  On July 26, 2004, Bybee returned to 325 Ohio Place, No. 8 and made contact with Gable.  Id.  Gable confirmed that he received shipments of ketamine from Dinev and Flowers.  *Id*. at 76-77.

On August 12, 2004, Defendant Bybee was notified by Postal Inspector Moffitt that a package from Bulgaria addressed to 1370 13th Street had arrived.  *Id*. at 77.  On August 17, 2004, U.S. Postal Service and U.S. Customs seized the package.  *Id*. 78, Ex.3.  Special Agent Edward Wrage of U.S. Customs verified that the package contained thirty-five vials of ketamine with manufacturer's labels and tamper proof seals.  *Id*. at 78-79, Ex. 3.

On August 20, 2004, Defendant Bybee obtained an anticipatory search warrant for 1370 13th Street, pending the delivery and acceptance of the package. *Id*. at Exs. 3, 4. Sarasota County Sheriff has a written policy that outlines the procedures for executing search warrants and the three classifications for search warrants: low hazard, high hazard, and special hazard. *Id*. at 52-53, Ex. 2. In accordance with the policy, Defendant Bybee classified the subject warrant as a high hazard. *Id*. at 52-53, Ex. 2.

On August 20, 2004,[3] a briefing was held to discuss the execution of the warrant. [Legg Dep. P. 24-27].  In attendance were officers from the Postal Service, Customs Service, and Sarasota County Sheriff's Office.  *Id*. The following officers from Sarasota County Sheriff's Office attended the briefing: Defendants Graham, Bybee, and Legg and Detectives

---

[3] The date on the report is wrong.  [Bybee Dep. P. 86].

Falcone, Wallace, Manning, Minchin, Doyle, and Shaw. [Bybee Dep. Ex. 3]. During the briefing, the officers were organized into two teams: (1) an entry/search team, which included Defendants Bybee and Legg and Detectives Falcone, Manning, Minchin, Doyle, and Shaw; and (2) a perimeter team, which included Defendant Graham and Detective Wallace. [Bybee Dep. P. 100; Legg Dep. P. 20-21]. Defendant Legg decided that Defendant Graham would be on the perimeter team because she had not been through "entry" training. [Legg Dep. P. 21]. After the briefing, the teams departed for the subject's residence in separate unmarked vehicles for the entry/search and perimeter teams. [Bybee Dep. P. 104-105].

As the Court must take the facts in the light most favorable to Plaintiff, the Court refers to Plaintiff's deposition testimony to describe what happened next.[4] On August 20, 2004, the date of the incident, Plaintiff was a sixty-two year old woman with a long history of medical conditions, including rheumatoid arthritis and osteoarthritis. [Croom Dep.I. P. 30-36]. She had also undergone numerous surgeries prior to August 20, 2004.[5] *Id.*

Around 3:00 to 3:30 p.m. on August 20, 2004, Plaintiff, dressed in a one-piece bathing suit, was in the front yard of 1370 13th Street gardening when Postal Inspector Crockett, dressed as a mailman, approached her carrying a package. Crockett was wearing a one-way transmitter to allow Defendant Bybee to hear whatever conversation occurred during the

---

[4] *See Brooks v. Clayton County, Ga.*, 2009 WL 425949, *2 (N.D.Ga.2009).

[5] During her deposition, Plaintiff testified to having the following surgeries prior to August 20, 2004: right knee joint replacement, left knee joint replacement, arthroscopic surgery on right knee, rotor tear cuff left shoulder, total joint replacement left shoulder, back surgery, carpal tunnels on both hands, double bunionectomies, four toe joints on each foot removed, and a total wrist joint replacement. [Croom Dep.I. P. 33-34]

package delivery. [Bybee Dep. P. 113-114]. Crockett asked Plaintiff if she knew the person to whom the package was addressed. [Croom Dep.I. P. 73]. Plaintiff explained that she did not know the person, that she was not originally from the Sarasota area, and that she was in Sarasota visiting her son, whose wife had just committed suicide. Postal Inspector Crockett indicated that it was awfully hot for her to be out sunning. Plaintiff replied that she had rheumatoid arthritis with many surgeries, and that the sun made her feel better. Plaintiff showed Crockett the scars on her left shoulder and left knee. [Croom. Dep. I P. 78-79]. Crockett asked Plaintiff if she would sign for the package, and she signed for it. [Bybee Dep. P. 116]. Plaintiff then took the package inside the residence, and placed it on the computer table. [Croom Dep.I. P. 75].

The package was wired to emit a radio signal indicating that it had been opened. [Bybee Dep. P. 114]. The Entry Team waited in the raid van for the signal, but never received it. [Legg Dep. P. 65-67; Bybee Dep. P. 144]. Defendant Legg decided to begin the operation thirty (30) minutes after the package was delivered. [Bybee Dep. P. 114]. At that time, Plaintiff was back out in the front yard, still wearing the blue one-piece bathing suit. [Bybee Dep. P. 122-23]. Plaintiff was sitting on a piece of timber watering the plants, with only a gardening hose in her hands. [Croom Dep.I. P. 87-95].

Suddenly, Plaintiff heard people screaming and hollering "hit the ground, get down on the ground. Get down." [Croom Dep.I. P. 87]. The people yelling at her were dressed in black, had masks on, and were carrying guns. [Croom Dep.I. P. 87-88]. Plaintiff does not

recall the individuals identifying themselves as law enforcement officers. [Croom Dep.I. P. 93-4]. A female member of the group, later identified as Defendant Graham, came through the gate as Plaintiff was trying to get down on the ground. [Croom Dep.I. P. 88]. Defendant Graham yelled at Plaintiff to "get down." [Croom Dep.I. P. 88]. Plaintiff, who was then in a squatting position, said, "I'm getting down as fast as I can. I've got arthritis." [Croom Dep.I. P. 88; Croom Dep.I. P. 106]. Defendant Graham placed her hand on Plaintiff's back and pushed her forward. [Croom Dep.I. P. 104-6]. Defendant Graham then placed her foot on Plaintiff's back and pushed her from the squatting position to the ground. *Id.* Plaintiff never saw a gun, but testified that she felt it touch her hair, and heard it cock. [Croom Dep.I. P. 113]. During this incident, Plaintiff was crying. *Id.*

While Plaintiff was on the ground, the entry team entered the residence using a battering ram, even though the door was unlocked. [Bybee Dep. P. 136-137]. Once inside the residence, Detective Minchin encountered Dinev, who was brought into the common area. *Id.* at 137-139.

While the entry team entered and secured the residence, Plaintiff remained on the ground on her stomach with her arms out in front of her and with Defendant Graham's foot on her back for five to ten minutes. [Croom Dep.I. P. 109]. According to the Plaintiff, both of her shoulders and her back popped when she hit the ground. When Plaintiff was asked to stand up, Plaintiff indicated that she could not get off the ground. At that point, two men wearing masks came over and helped Plaintiff off the ground.

Plaintiff was brought into the residence and seated on the couch. [Croom Dep.I. P. 116-17]. According to Defendant Legg, Plaintiff was not yet free to leave. [Legg Dep. P. 75]. Plaintiff was taken from the couch and seated at the dining room table while Dinev was interviewed. [Bybee Dep. P. 142]. Dinev immediately admitted that he was bringing in ketamine from his home country of Bulgaria and reselling it at a profit, and that the ketamine in the package, as well as the small amount of methamphetamine found in the residence, belonged to him. [Dkt. 29]. He was arrested and taken away. *Id*.

While inside, Plaintiff watched as law enforcement personnel searched the residence, including her personal belongings. [Croom Dep.I. P. 117-119]. Plaintiff contends that she was not offered anything to eat or drink, and she was crying most of the time she was in the residence. [Croom Dep.I. P. 119]. It wasn't until Plaintiff was in the house that she realized that the individuals who entered the property were law enforcement officers. [Croom Dep.I. P. 212-13]. The law enforcement officers kept asking Plaintiff if she wanted to go to the hospital. Plaintiff declined the treatment even though she had some pain. She did not start to really hurt until later on that night, and the next day it got progressively worse. [Croom Dep.I. P. 140]. As a result of the incident, Plaintiff complains of "severe and permanent injuries" to her back and shoulder, as well as aggravation of a "pre-existing arthritic condition" and emotional distress. [Dkt. 2].

Plaintiff was unsure exactly how long she was kept in the house, but estimated that it "maybe" lasted two hours. [Croom Dep.I. P. 120]. No one ever told Plaintiff that she was

free to leave throughout the investigation. [Legg Dep. P. 75; Bybee Dep. P. 143]. Defendant Legg estimated that a total of forty-five to sixty minutes passed from the beginning of the warrant service until the officers departed. [Legg. Dep. P. 72-73].

The search of the residence resulted in the discovery of additional ketamine, as well as baggies of methamphetamine. [Bybee Dep. 143-146, Ex. 3]. Dinev was charged with possession of both controlled substances. *Id*. at Ex. 3. Possession of methamphetamine is a felony. [Legg. Dep. P. 89-90]. Possession of ketamine with the intent to sell is a felony. [Legg. Dep. P. 90].

## MOTION TO STRIKE AFFIDAVIT

### Standard of Review

Under Federal Rule of Civil Procedure 12(f), the Court may order any "redundant, immaterial, impertinent, or scandalous matter" stricken from any pleading upon the motion of any party. Fed.R.Civ.P. 12(f). A motion to strike is denied "unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Pashoian v. GTE Directories n/k/a Verizon Directories,* 208 F.Supp.2d 1239, 1297 (M.D.Fla.2002) (*citing Story v. Sunshine Foliage World. Inc.,* 120 F.Supp.2d 1027, 1030 (M.D.Fla.2000) (*quoting Seibel v. Society Lease, Inc.,* 969 F.Supp. 713, 715 (M.D.Fla.1997))). Generally, a motion to strike is limited to the matters contained within the pleadings. *McNair v. Monsanto*, 279 F.Supp.2d 1290, 1298 (M.D.Ga.2003) (stating that a motion to strike that addresses affidavits is not proper). Under Federal Rule of Civil Procedure 7(a), pleadings

include only the complaint, the answer, the reply to any counterclaim, and the answer to any cross-claim. Fed.R.Civ.P. 7(a). To object to the substance contained in a motion, the opposing party should raise such objections in the material it submits in opposition to the motion, rather than in a motion to strike. *Smith v. Southeastern Stages, Inc.,* 479 F.Supp. 593, 594-595 (N.D.Ga.1977). The court can then consider and rule upon the objections when it decides whether to grant the motion. *Id.* at 595.

An affidavit submitted in connection with a motion for summary judgment must meet the standards set forth under Federal Rule of Civil Procedure 56(e). *Story*, 120 F.Supp.2d at 1030 (*citing Barnebey v. E.F. Hutton & Co.*, 715 F.Supp. 1512 (M.D.Fla.1989)). Rule 56(e) provides that an affidavit "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant is competent to testify on the matters stated." Fed.R.Civ.P. 56(e). Accordingly, the Court must strike an affidavit "when it is a conclusory argument, rather than a statement of fact, or when the affidavit is not based on personal knowledge." *Pashoian*, 208 F.Supp.2d at 1297 (*citing Story*, 120 F.Supp.2d at 1030).

### Discussion

Included as a part of Plaintiff's response to Defendant Graham's Dispositive Motion for Partial Summary Judgment, Plaintiff requests this Court to strike Defendant Graham's affidavit. [Dkt. 50]. Plaintiff asserts that the affidavit is a "sham" because it is "wholly inconsistent" with the statements made by Defendant Graham during her deposition. [Dkt.

50].  According to Plaintiff, Defendant Graham could not recall crucial details of the incident

on August 20, 2004, during her deposition, yet offers "numerous epiphanies" in her affidavit

that "directly and materially conflict" with her earlier sworn testimony without explanation.

 [Dkt. 50].  In response, Defendant Graham asserts that the Court should not strike her

affidavit because it is consistent with her deposition testimony, as it "explains various aspects

and clarifies certain ambiguities created by shifts in the questioning at deposition." [Dkt. 59].


The Court may disregard an affidavit as a "sham" when a party contradicts prior

deposition testimony without providing a valid explanation. *See Van T. Junkins & Assoc. v.*

*U.S. Industries, Inc.*, 736 F.2d 656 (11th Cir.1984) (holding that when "a party has given

clear answers to unambiguous questions which negate the existence of any genuine issue of

material fact, that party cannot thereafter create such an issue with an affidavit that merely

contradicts, without explanation, previously given clear testimony.")  However, there is a

clear distinction between discrepancies that "create transparent shams" and discrepancies that

"create an issue of credibility or go to the weight of the evidence." *Tippens v. Celotex Corp.*,

805 F.2d 949, 953 (11th Cir.1986). The Eleventh Circuit recognized that:

> [t]o allow every failure of memory or variation in a witness's testimony to be
> disregarded as a sham would require far too much from lay witnesses and
> would deprive the trier of fact of the traditional opportunity to determine
> which point in time and with which words … the affiant … was stating the
> truth.

*Id.* at 953-54.  Accordingly, the Court should not strike an affidavit if it "supplements earlier

testimony, presents a variation of testimony, or represents instances of failed memory." *Pashoian*, 208 F.Supp.2d at 1298-99 (*citing Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1530 (11th Cir.1987)). Instead, such "[v]ariations in witness testimony and failure of memory throughout the course of discovery" create issues of credibility of witnesses and weight of evidence that are resolved by the trier of fact. *Tippens*, 805 F.2d at 954.

Applying the foregoing principals to the instant case, this Court finds that Defendant Graham's affidavit is not a sham. Any inconsistencies, discrepancies, and failures of memory go to the weight and credibility of the evidence.

Plaintiff first asserts that Defendant Graham's affidavit contradicts her prior deposition testimony concerning her position during the execution of the search warrant. [Dkt. 50]. Specifically, Defendant Graham was asked what her job was the day of the incident. [Graham Dep. P. 25]. Defendant Graham testified that she was assigned the duty of property recorder, but she did not "recall" being a member of the perimeter team. *Id*. Defendant Graham later submitted an affidavit wherein she stated, "[m]y job was to secure the exterior of the property … After entry was effected and the premises and persons secure, my job was to take possession and log seized evidence into property." [Dkt. 34]. As such, the Court finds that any inconsistency between the affidavit and deposition testimony is merely a "failure of memory," which goes to the weight and credibility of the evidence, and, thus, Plaintiff's Motion to strike is denied as to this statement.

Second, Plaintiff asserts that Defendant Graham's affidavit conflicts her prior

deposition testimony regarding her interaction with Plaintiff. [Dkt. 50]. On at least three occasions during her deposition, Defendant Graham testified: "I don't recall any independent interaction with [Plaintiff], nothing to the extent where I had to use any kind of force. If I had interaction with her, it was so unnotable or insignificant, that it is not memorable." [Graham Dep. P. 48]. Defendant Graham further testified, "I would recall if I would have had to use force enough to push someone down and injure them." [Graham Dep. P. 50-51]. Later, when asked if she had any independent recollection of what she did with respect to the Plaintiff, Defendant Graham testified, "[n]ot what I did, but I know what I did not do." [Graham Dep. P. 51]. Finally, when asked if she recalled pushing Plaintiff to the ground, placing a boot on Plaintiff's back, shoving Plaintiff to the ground forcefully, and pointing a gun to Plaintiff's head, Defendant Graham testified she "did not" do such things. [Graham Dep. P. 78-79]. In her affidavit, Defendant Graham stated, "I did not forcibly push Ms. Croom by placing my hand or foot on her back, tell her to shut up, or point or hold a gun at her. If any contact with [Ms.] Croom occurred, it was minor and unnotable." [Dkt. 34]. Contrary to Plaintiff's assertion, Defendant Graham's statement in her affidavit is wholly consistent with her earlier testimony, and at most, supplements her earlier testimony. Defendant Graham stated during her deposition that she knew what she did not do to the Plaintiff. Her subsequent affidavit merely lists the actions she claims she did not take. Accordingly, Plaintiff's Motion to Strike is denied as to this statement.

Third, Plaintiff moves to strike Defendant Graham's affidavit statement that "[o]nce

entry was completed and the premises were secured, Ms. Croom was escorted inside and seated on a sofa." [Dkt. 50]. During her deposition, when asked where she was, what she did, what she saw, and what she heard from the point in time between the controlled delivery and the time of entry into the residence, Defendant Graham stated numerous times that she did not remember. [Graham Dep. P. 46-48]. Defendant Graham's inability to remember what she did during this time period does not rise to the level of creating an irreconcilable contradiction. Any inconsistency constitutes a "failure of memory" that does not warrant the affidavit being stricken. Plaintiff's Motion to Strike is, therefore, denied as to this statement.

Fourth, Plaintiff asserts that Defendant Graham's affidavit contradicts her prior deposition testimony concerning her observation of Plaintiff after she was brought inside the residence. [Dkt. 50]. Specifically, when asked whether she could tell if the Plaintiff was in pain, Defendant Graham testified, "I don't remember hearing anything specific … I think I would remember if I heard her crying, screaming. Anything like that would be unusual and I would remember, but I don't remember anything out of the ordinary." [Graham Dep. P. 75-76]. Further, Defendant Graham testified that she did not have any independent recollection of anything Plaintiff did or said once she was inside the house. [Graham Dep. P. 76]. In her affidavit, Defendant Graham stated, "Ms[.] Croom did not appear to be in discomfort or pain. I did not observe her to be crying. She made no complaint of injuries, problems or symptoms and none were observed." [Dkt. 34]. Although Defendant Graham now affirmatively states that she observed Plaintiff inside the residence, Plaintiff did not appear to be in pain, and

Plaintiff made no complaints, these affirmations do not baldly repudiate the earlier sworn deposition testimony, wherein she testified that she had no independent recollection. As such, Plaintiff's Motion to Strike is denied as to this statement.

Finally, Plaintiff moves to strike Defendant Graham's affidavit statement that she "knew … drugs were sold," that the "warrant was classified as a high risk," and she felt that she had "reasonable suspicion" that Plaintiff may be involved in drug activities, asserting that such statements constitute improper legal conclusions and/or constitute inadmissible hearsay. [Dkt. 5]. During her deposition, Defendant Graham testified that she considers "all people a threat that are on the scene" of where they are going to execute a search warrant, and Plaintiff was a threat because "she took delivery" or "accepted the delivery" of a package containing drugs. [Graham Dep. P. 60-64]. Further, when asked whether that behavior provided her with reasonable suspicion that Plaintiff had committed any crime, or was committing a crime, Defendant Graham responded, "I don't recall what I thought at that moment in time." *Id*. at 64. After reviewing the deposition testimony in its entirely, it becomes readily apparent that Defendant Graham failed to give clear answers to this line of questioning. Thus, although the information contained in the affidavit does not entirely synchronize with the deposition testimony, it does not contradict or repudiate previously given clear testimony. In addition, contrary to Plaintiff's assertion that Defendant Graham offers "no explanation as to how she <u>now</u> comes to posses that knowledge," Defendant Graham claims that reviewing what others have said in their depositions has refreshed her

recollection. [Dkt. 59]. Therefore, Defendant Graham's affidavit meets the knowledge requirement. Plaintiff's Motion to Strike is denied as to these statements.

## MOTION FOR SUMMARY JUDGMENT

### Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A factual dispute alone is not enough to defeat a properly pled motion for summary judgment; only the existence of a genuine issue of material fact will preclude a grant of summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Mize v. Jefferson City Bd. of Educ*., 93 F.3d 739, 742 (11th Cir.1996) (*citing Hairston v. Gainesville Sun Publ'g Co*., 9 F.3d 913, 918 (11th Cir.1993)). A fact is material if it may affect the outcome of the suit under the governing law. *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir.1997). The moving party bears the initial burden of showing the Court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. *Hickson Corp. v. N. Crossarm Co*., 357 F.3d 1256, 1260 (11th Cir.2004) (*citing Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *See also Edwards v. Acadia Really Trust, Inc.*, 141 F.Supp.2d 1340, 1344-45 (M.D.Fla.2001). There is no genuine issue of material fact when "the record taken as a whole could not lead a rational trier of fact to

find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 242. However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. In ruling on a motion for summary judgment, "the function of the court is not to weigh the evidence and determine the truth of the matter but to determine whether there is an issue for trial." *Edwards*, 141 F.Supp.2d at 1345. When faced with a "properly supported motion for summary judgment, [the non-moving party] must come forward with specific factual evidence, presenting more than mere allegations." *Garguilo v. G.M Sales, Inc.*, 131 F.3d 995, 999 (11th Cir.1997). "The evidence presented cannot consist of conclusory allegations or legal conclusions." *Avirgan v. Hull*, 932 F.2d 1572, 1577 (11th Cir.1997).

If there is a conflict between the parties' allegations or evidence, the non-moving party's evidence is presumed to be true and all reasonable inferences must be drawn in the non-moving party's favor. *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161, 1164 (11th Cir.2003). If a reasonable fact finder, evaluating the evidence, could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, the court should not grant summary judgment. *Samples ex rel. Samples v. City of Atlanta*, 846

F.2d 1328, 1330 (11th Cir.1988) (*citing Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau,* 835 F.2d 855, 856 (11th Cir.1988)). However, if the non-movant's response consists of nothing "more than a repetition of his conclusional allegations," summary judgment is not only proper, but required. *Morris v. Ross*, 663 F.2d 1032, 1034 (11th Cir.1981).

## Discussion

Plaintiff alleges claims under 42 U.S.C. § 1983 against Sheriff Balkwill, Sergeant Legg, Detective Bybee, and Deputy Graham for unlawful arrest and excessive use of force. [Dkt. 2]. Specifically, Plaintiff alleges that Defendants deprived Plaintiff of her Fourth and Fourteenth Amendment rights by unlawfully arresting her without "reasonable suspicion, probable cause, or arguable probable cause" and subjecting her to "physical and emotional pain and suffering." *Id.* Plaintiff alleges that these constitutional rights to which she was deprived were clearly established, and, therefore, Defendants are not entitled to qualified immunity. *Id.*

### I.  Qualified Immunity

Section 1983 imposes civil liability on any person who, under color of state law, "subjects, or causes to be subjected" a person "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Qualified immunity balances two important interests: the need to hold public officials accountable when they exercise power irresponsibly with the need to shield officials from harassment, distraction,

and liability when they perform their duties reasonably. *Pearson v. Callahan,* --- U.S. ----, ----, 129 S.Ct. 808, 815, (2009). As long as the official's conduct is not unlawful, the doctrine of qualified immunity exempts the government official from damage suits to enable them to perform their responsibilities without threats of liability. *Hutton v. Strickland*, 919 F.2d 1531, 1536 (11th Cir.1990).

Qualified immunity is not merely a defense to liability, but rather, immunity from a lawsuit. *Atterbury v. City of Miami Police Dep't,* 2009 WL 868014 (11th Cir.Fla. Apr. 2, 2009) (*citing Pearson*, 129 S.Ct. at 815). Qualified immunity protects government officials performing discretionary functions as long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sharp v. Fisher*, 532 F.3d 1180, 1183 (11th Cir.2008) (*citing Beshers v. Harrison,* 495 F.3d 1260, 1265 (11th Cir.2007)). Qualified immunity relieves government officials from the need to "constantly err on the side of caution" by protecting them from liability and the burdens of litigation. *Holmes v. Kucynda*, 321 F.3d 1069, 1077 (11th Cir.2003) (citations omitted). However, "it does not offer protection 'if an official knew or reasonably should have known that the action he took within his sphere of official responsibility would violate the constitutional rights of the [plaintiff].'" *Id*. (*citing Lambert v. Fulton County,* 253 F.3d 588, 596 (11th Cir.2001)).

A plaintiff seeking to overcome the defendant's privilege of qualified immunity must show: "(1) that the officer violated her federal constitutional or statutory rights, and (2) that

those rights were clearly established at the time the officer acted." *Douglas Asphalt Co. v. Qore, Inc*., 541 F.3d 1269, 1273 (11th Cir.2008). The Court recognizes the Supreme Court's recent decision, *Pearson v. Callahan,* 129 S.Ct. 808, 818, (2009), wherein it held that the two-prong analytical sequence is not mandatory, but rather, courts are permitted to "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case." The Court will follow the traditional approach and first consider whether the facts alleged, taken in the light most favorable to the plaintiff, establish a constitutional violation at all. *Holmes*, 321 F.3d at 1077. If no constitutional violation is established, then no further inquiries regarding qualified immunity are needed. *Id*. If, on the other hand, the facts establish a constitutional violation, then the plaintiff must further show that the right was "clearly established." *Id*. (*citing Saucier v. Katz,* 533 U.S. 194, 201, (2001)). In the Eleventh Circuit, "for the law to be clearly established to the point that qualified immunity does not apply, the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors in the defendants' place, that what he is doing violates federal law." *Jenkins v. Talladega City Board of Education*, 115 F.3d 821, 823 (11th Cir.1997) (en banc) (*citing Anderson v. Creighton,* 483 U.S. 635, 640 (1987)). "[A] public official is entitled to qualified immunity unless, at the time of the incident, the preexisting law dictates, that is, truly compel[s], the conclusion for all reasonable similarly situated public officials that what [the official] was doing violated [the plaintiff's] federal rights in the

circumstance." *Wilson v. Zellner*, 200 F.Supp.2d 1356, 1360 (M.D.Fla.2002), (*citing Marsh v. Butler County,* 268 F.3d 1014, 1030-31 (11th Cir.2001) (en banc)).

It is undisputed that on August 20, 2004, Defendants Graham, Bybee, and Legg were acting within their discretionary authority as law enforcement officers. [Dkt. 2]. Therefore, the burden shifts to Plaintiff to show that the officers are not entitled to qualified immunity. Plaintiff must demonstrate that her allegations establish a cognizable constitutional violation and that the rights in question (in this case, the constitutional rights to be free from unlawful arrest and excessive force during the service of narcotics search warrant) were clearly established on August 20, 2004, so that a reasonable officer would have known that what he or she was doing violated federal law.[6]

1.  Unlawful Arrest.

There are three broad categories of police-citizen encounters for purposes of a Fourth Amendment analysis: "(1) police-citizen exchanges involving no coercion or detention; (2) brief seizures or investigatory detentions; and (3) full-scale arrests." *United States v. Perez,* 443 F.3d 772, 777 (11th Cir.2006). The Eleventh Circuit explained when an encounter implicates the Fourth Amendment:

> The first category of consensual encounters does not implicate fourth amendment scrutiny. The second category involves reasonably brief encounters in which a reasonable person would have believed that he or she was not free to leave. In order to justify such a fourth amendment 'seizure,' the

---

[6] The Court will focus on the first step of the qualified immunity analysis, whether Plaintiff's constitutional rights were violated. If the Court determines that a full-scale arrest occurred, there is no question that the second step is satisfied because it is clearly established that an arrest without probable cause violates the Fourth Amendment. *Thornton v. City of Macon*, 132 F.3d 1395, 1399 (11th Cir.1998).

government must show a reasonable, articulable suspicion that the person has committed or is about to commit a crime. Finally, when the totality of circumstances indicate that an encounter has become too intrusive to be classified as a brief seizure, the encounter is an arrest and probable cause is required.

*United States v. Espinosa-Guerra*, 805 F.2d 1502, 1506 (11th Cir.1986) (citations omitted).

Viewing the facts most favorable to the Plaintiff, it is indisputable that Plaintiff's encounter with Defendants does not constitute a consensual encounter. Plaintiff "vigorously" contends that initial stop was not the kind of stop that *Terry v. Ohio*, 392 U.S. 1 (1968), permits to be made without probable cause, because the officers lacked reasonable suspicion to detain her. [Dkt. 52]. Assuming *arguendo* that the officers did have reasonable suspicion to make a valid *Terry* stop, Plaintiff asserts that the stop quickly transformed into an arrest without probable cause. *Id.* This Court disagrees with both of Plaintiff's contentions.

In *Terry*, the Supreme Court adopted "a [dual] inquiry for evaluating the reasonableness of an investigative stop." *United States v. Sharpe*, 470 U.S. 675 (1985); *see also United States v. Acosta*, 363 F.3d 1141, 1144 (11th Cir.2004). Under this approach, the court examines "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Sharpe*, 470 U.S. at 682. Whether an officer's actions were justified at the inception "turns on whether the officers had a reasonable suspicion that the [plaintiff] had engaged, or was about to engage, in a crime." *Acosta*, 363 F.3d at 1144-45. In the second part, the court looks to whether the stop was reasonably related in scope to the circumstances that justified

the stop in the first place. *Id*.

The officers were allowed to stop Plaintiff if, under the totality of the circumstances, they had an objectively reasonable suspicion that she had engaged, or was about to engage, in a crime. "The 'reasonable suspicion' must be more than an 'inchoate and unparticularized suspicion or hunch.'" *United States v. Powell*, 222 F.3d 913, 917 (11th Cir.2000) (*quoting Terry*, 392 U.S. at 27). Even though "reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (*citing United States v. Sokolow*, 490 U.S. 1, 7 (1989)). A law enforcement official is still entitled to qualified immunity if he or she "reasonably but mistakenly concludes that reasonable suspicion is present." *Jackson v. Sauls*, 206 F.3d 1156, 1165-66 (11th Cir.2000). "When an officer asserts qualified immunity, the issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support an investigatory stop." *Id*.

Defendants Graham, Bybee, and Legg all had, at a minimum, "arguable" reasonable suspicion to make an investigatory stop. The Defendants were executing a narcotics search warrant on the residence based on probable cause. [Graham Dep. Ex. 1]. Plaintiff was observed entering and exiting the residence where the warrant was about to be served. [Legg Dep. P. 37-39; Bybee Dep. P. 113-114]. The Supreme Court recognized that an occupant's connection with a home where officers are executing a search warrant provides a basis for

objective suspicion of that occupant:

> The existence of a search warrant, however, also provides an objective justification for the detention. A judicial officer has determined that police have probable cause to believe that someone in the home is committing a crime. Thus a neutral magistrate rather than an officer in the field has made the critical determination that the police should be given a special authorization to thrust themselves into the privacy of a home. The connection of an occupant to that home gives the police officer an easily identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant.

*Michigan v. Summers*, 452 U.S. 692, 703-704 (1981). In addition, assuming that Plaintiff had the detailed conversation with Postal Inspector Crocket, it does not negate the fact that she still accepted a package containing narcotics. Because Plaintiff was occupying the residence when the warrant was served and she accepted a package containing narcotics, the Defendants Graham, Legg, and Bybee's suspicion that Plaintiff had engaged or was about to engage in the crime was objectively reasonable.

The Court must now consider whether Plaintiff's detainment crossed the line into a full-scale arrest, which requires a showing of probable cause, as opposed to just reasonable suspicion. The Eleventh Circuit applies a "non-exclusive" four-part test to determine whether an investigatory detention matures into an "arrest:" (1) "the law enforcement purposes served by the detention," (2) "the diligence with which the police pursue the investigation," (3) "the scope and intrusiveness of the detention," and (4) "the duration of the detention." *Acosta*, 363 F.3d at 1146.

When analyzing the first factor, the most significant consideration is whether law

enforcement pursued "a method of investigation that was likely to confirm or dispel their suspicions quickly, and with a minimum of interference.'" *Id.* (*citing United States v. Gil*, 204 F.3d 1347, 1351 (11th Cir.2000) (*quoting United States v. Hardy*, 855 F.2d 753, 759 (11th Cir.1988)). Here, the officers approached the residence yelling at Plaintiff to "get down on the ground." [Croom Dep.I. P. 87]. Plaintiff was then forcibly pushed to the ground, and detained there for five to ten minutes. [Croom Dep.I. P. 104-109]. Once entry was made and the residence was secure, Plaintiff was escorted into the living room of the residence and seated on the couch. [Croom Dep.I. P. 116-17]. The officers searched the residence and interviewed Dinev. [Croom Dep.I. P. 117-119; Legg Dep. P. 75]. After the interview with Dinev about twenty to thirty minutes later, the officers determined that Plaintiff was not involved in the illegal activity. [Legg Dep. P. 75]. Plaintiff was then free to go; although she was neither told she could leave nor asked if she could leave. [Bybee Dep. P. 142]. The entire course of events lasted about one hour, and at most, Plaintiff guessed it "maybe" lasted two hours. [Legg Dep. P. 72-73; Croom Dep.I. P. 120; Dkt. 34]. This series of events was designed to lead to a quick resolution of the officers' reasonable suspicions. It was necessary for the officers to detain Plaintiff to prevent her from jeopardizing their investigation of the residence, and Plaintiff was detained for only as long as it was necessary to complete their investigation of the residence. *See Gil*, 204 F.3d at 1351.

Furthermore, when executing a search warrant, law enforcement officers temporarily

detain individuals for the legitimate purposes of preventing flight, maintaining control, and ensuring the safety of everyone on the scene. One district court aptly recognized that:

> [d]espite whatever precautions may be taken, it is inevitable that some potentially dangerous police activities will occur among private citizens. These private citizens, while wholly innocent bystanders, often may introduce additional variables at a time when the primary and legitimate goal of the police is to secure control of the situation. Failure to gain complete control of the situation may endanger the success of the police operation, as well as the safety of the innocent bystanders and law enforcement officers. Thus, police have a strong interest in securing the arrest scene, including if necessary the temporary detention of third persons who may be present.

*Thompson v. City of Lawrence*, 1994 WL 262598 (D. Kan. 1994). The Eleventh Circuit has likewise recognized that "a police officer performing his lawful duties may direct and control-to some extent-the movements and location of persons nearby, even persons that the officer may have no reason to suspect of wrongdoing," *Hudson v. Hall*, 231 F.3d 1289, 1297 (11th Cir.2000). As shown in the cases above, the fact that the Plaintiff turned out to be an innocent bystander does not mean that Defendants Graham, Legg, and Bybee had no right to control her movements. Because the series of events led to a quick resolution and the detention served the legitimate purposes of investigating the house, maintaining control, and ensuring safety, the first factor weighs heavily in favor of the legality of the seizure.

Under the second factor, the Eleventh Circuit asks, "whether the police were diligent in pursuing their investigation, that is, whether the methods the police used were carried out without unnecessary delay." *Acosta*, 363 F.3d at 1146. Nothing in the record indicates that the officers were anything but diligent in carrying out the execution of the search warrant.

Instead, the record shows that the officers promptly secured the premises, entered the residence, searched the residence, interviewed a suspect, and ascertained the Plaintiff's involvement, or lack thereof. Here, each investigatory act logically led to the next act, all of which was done without delay and within one to two hours. Therefore, the second factor weighs in favor of the legality of the detainment.

Under the third factor, the Eleventh Circuit asks, "whether the scope and intrusiveness of the detention exceeded the amount reasonably needed by police to ensure their personal safety." *Acosta*, 363 F.3d at 1146. The Supreme Court has established that officers may take reasonable steps to ensure their safety so long as they possess "an articulable and objectively reasonable belief that the suspect is potentially dangerous." *Id.* (*citing Michigan v. Long*, 463 U.S. 1032, 1051 (1983)). The Supreme Court has also recognized the danger associated with the execution of a narcotics search warrant:

> [T]he execution of a warrant to search for narcotics is the kind of transaction that may give rise to sudden violence or frantic efforts to conceal or destroy evidence. The risk of harm to both the police and the occupants is minimized if the officers routinely exercise unquestioned command of the situation.

*Summers*, 452 U.S. at 702-703. *See also United States v. Diaz-Lizaraza*, 981 F.2d 1216, 1221 (11th Cir.1993) (noting that "[d]rug dealing is known to be extremely violent.") Although in hindsight Defendant Graham's detention of the Plaintiff likely exceeded the amount necessary to ensure safety, Defendant Graham was forced to make a split second decision. *See Graham v. Connor*, 490 U.S. 386, 395 (1989) (holding that objective reasonableness must be judged from "perspective on reasonable officer on the scene, rather

than with 20/20 vision of hindsight").  Defendant Graham testified that she perceived Plaintiff as a threat because "she took delivery" or "accepted the delivery" of a package containing narcotics.  [Graham Dep. P. 60-64].  Because the execution of a narcotics search warrant is commonly associated with sudden outbursts of violence, it was, therefore, objectionably reasonable for Defendant Graham to make the split second decision that Plaintiff was potentially dangerous, and detain her.

It also is well established that the right to temporarily detain someone "carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham*, 490 U.S. at 396.  The Eleventh Circuit has previously held that an investigatory stop does not transform into an arrest merely "because an officer draws his weapon, handcuffs a suspect, orders a suspect to lie face down on the ground, or secures a suspect in the back of a patrol car." *Acosta*, 363 F.3d at 1147 (citations omitted).  *See also United States v. Rope*r, 702 F.2d 984, 987 (11th Cir.1983) (stating that "an officer's display of weapons does not necessarily convert an investigatory stop into an arrest.") Moreover, the Eleventh Circuit ruled that "an individual's proximity to illegal activity may [ ] be considered" when determining whether there were reasonable grounds to justify a detention. *United States v. Hunter*, 291 F.3d 1302, 1306 (11th Cir.2002) (*citing United States v. Brown*, 159 F.3d 147, 150 (3d Cir.1998)).  It is indisputable that Plaintiff was in close proximity to illegal activity.  In fact, Plaintiff, although unwittingly, accepted a package contained narcotics.  [Bybee Dep. P. 130]. Therefore, Defendants Graham, Bybee, and Legg had reasonable grounds to detain Plaintiff

until her involvement in the illegal activity was ascertained. Accordingly, just because Defendant Graham forced Plaintiff to the ground, allegedly drew her gun, and later, along with Defendants Legg and Bybee, secured Plaintiff in the residence does not ripen this detainment into an arrest. Thus, the third factor weighs in favor of the legality of the seizure.

Finally, the Court considers the duration of the detention. There is no bright line rule regarding the permissible duration of an investigative stop. *Acosta*, 363 F.3d at 1147. The test is one of "common sense and ordinary human experience." *Id.* (*quoting United States v. Sharpe*, 470 U.S. 675, 685 (1985)). In *Sharpe*, the Supreme Court explained that the courts "must consider whether the police diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id.* (*citing Sharpe*, 470 U.S. at 686). As discussed in detail above, this Court believes that the officers diligently pursued a means of investigation likely to confirm or dispel their suspicions quickly.

This Court also believes that the total amount of time Plaintiff was detained was reasonable in relation to the purpose of the stop. As explained above, the purpose of Plaintiff's detention was to investigate the residence without interruption, ensure her own safety and the officers' safety, and maintain control over the scene. Plaintiff was detained on the ground for five to ten minutes. [Croom Dep.I. P. 104-109]. Once entry was made and the residence was secure, Plaintiff was escorted into the living room of the residence and seated on the couch. [Croom Dep.I. P. 116-17]. After about twenty to thirty minutes, the

Defendants determined that Plaintiff not involved in the illegal activity. She was then free to go; even though she was neither told she could leave nor asked if she could leave. [Bybee Dep. P. 142]. The entire course of events lasted about one hour, and at most, Plaintiff guessed it "maybe" lasted two hours. [Legg Dep. P. 72-73; Croom Dep.I. P. 120; Dkt. 34].

In *United States v. Gil*, a drug-conspiracy case, the Eleventh Circuit rejected the defendant's contention that because she was detained for approximately seventy-five minutes in handcuffs in the back of a patrol car her detention exceeded the duration of an allowable investigatory stop and ripened into a full scale arrest. 204 F.3d at 1350. In the instant case, the Plaintiff's detention, although possibly longer in duration, was not nearly as severe as the detention in *Gil*. Here, the Plaintiff was not handcuffed, and was seated inside on a couch, as opposed to being handcuffed and placed in a patrol car. [Croom Dep.I. P. 123]. The Eleventh Circuit has noted that it is impossible to entirely divorce the duration of the stop from the other conditions of the detention, "[t]wenty minutes' detention out of doors on a North Carolina spring morning, may be less intrusive than twenty minutes spent under a broiling sun, in a police station, or in a small airport office." *Hardy*, 855 F.2d at 761. On the facts of this case, this Court cannot say the length of the stop, by itself, invalidated the detention.

After considering the totality of the circumstances, this Court holds that the investigatory stop did not mature into an arrest. Thus, contrary to Plaintiff's assertion, a

showing of probable cause was not required. Accordingly, this Court finds that there was

no underlying constitutional violation for unlawful arrest by Defendants Graham, Legg, and

Bybee. Because the Plaintiff failed to establish a constitutional violation, the Court need not

consider whether Plaintiff's right was "clearly established." *Holmes*, 321 F.3d at 1077.

      2.    Excessive Force.

Plaintiff also claims that Defendant Graham used excessive force to detain her. [Dkt.

2]. The evidence, in the light most favorable to Plaintiff shows that when Defendant Graham

approached Plaintiff yelling at her to "get down," Plaintiff, who was then in a squatting

position, said, "I'm getting down as fast as I can. I've got arthritis." [Croom Dep.I. P. 88;

106]. Defendant Graham placed her hand on Plaintiff's back and pushed her forward.

[Croom Dep.I. P. 88104-6]. Then, Defendant Graham placed her foot on Plaintiff's back and

pushed her from the squatting position to the ground. *Id.* Plaintiff never saw a gun, but

testified that she felt it touch her hair, and heard it cock. [Croom Dep.I. P. 113]. Plaintiff

remained on the ground with Defendant Graham's foot on her back for five to ten minutes.

Plaintiff's board-certified orthopedic surgeon testified that this altercation was the sole cause

of the subsequent surgeries to Plaintiff's shoulders and back. [Woloszyn Dep. P. 36-41].[7]

All claims that law enforcement officers have used excessive force in the course of

an arrest, investigatory stop, or other "seizure" of a free citizen are analyzed under the Fourth

---

[7] Like the Eleventh Circuit explained in *Rodriguez v. Farrell*, 280 F.3d 1341, 1351 (11th Cir.2002) given
the extent of the injuries suffered by Plaintiff, this Court is "presented with the proverbial 'hard case,' that
is, one in which one's natural sympathies are aroused by the plaintiff's plight. We recall Justice Jackson's
warning to judges: 'We agree that this is a hard case, but we cannot agree that it should be allowed to make
bad law.'" (*quoting FCC v. WOKO, Inc*., 329 U.S. 223, 229(1946)).

Amendment's "reasonableness" standard. *See Graham*, 490 U.S. at 395. The Supreme Court has made clear that police officers may use some force in affecting the Plaintiff's detainment, "the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Id*. at 396. Accordingly, "the application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." *See Nolin v. Isbell*, 207 F.3d 1253, 1257 (11th Cir.2000).

To determine whether the force is reasonable, courts look to the facts and circumstances of each case, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 395. The "reasonableness" of the use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* The "calculus of reasonableness" must embody allowance for the fact that police officers are often forced to make split-second judgments in tense, uncertain, and rapidly changing situations. *Id*. at 396-97. "[T]he "reasonableness" inquiry in an excessive force case is an objective one: the question is whether the officers' actions are "objectively reasonable" in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

Taking the facts in the light most favorable to Plaintiff, the first *Graham* element is

the severity of the crime at issue. Plaintiff contends the record is completely absent of any evidence that indicates, "she was engaged, was in the process of engaging in, or was about to engage in any crime." [Dkt. 50]. Plaintiff asserts that there is no need to even consider the severity of the crime at issue "because no crime whatsoever was involved." *Id*. However, this argument ignores that fact that the officers were lawfully executing a third degree felony narcotics search warrant. *See* Florida Statute § 893.13(1)(a)2. Moreover, the Plaintiff's argument fails to consider that she accepted the package containing narcotics, although unwittingly. Thus, as discussed above, there was objective, reasonable suspicion that Plaintiff was involved in a serious crime. This factor weighs against the Plaintiff.

The second *Graham* element is Plaintiff's perceived threat to the officers and to others. Plaintiff contends that she posed no immediate threat because she was a sixty-two year old woman, dressed in a one-piece bathing suit, wearing no shoes, and with easily visible hands not concealing any weapons. [Dkt 50]. As discussed in more detail above, the execution of a narcotics warrant is linked to outbursts of sudden violence. Although in 20/20 hindsight Defendant Graham's detention of the Plaintiff likely exceeded the amount needed to ensure her safety and the safety of her fellow officers, Defendant Graham was forced to make a split second decision–that Plaintiff was a threat because "she took delivery" of a controlled substance and was on the scene of a narcotics search warrant. Thus, Defendant Graham could reasonably perceive Plaintiff as a threat, and this factor weights against the Plaintiff.

The third *Graham* element requires very little analysis because there is no evidence on the record that indicates Plaintiff was actively resisting arrest or attempting to evade arrest by flight. Thus, this factor weighs in favor of the Plaintiff. Applying the *Graham* factors to the record evidence shows that Defendant Graham's determination that force was needed to detain Plaintiff was reasonable. Unfortunately for Plaintiff, she unwittingly got involved in a serious crime commonly associated with violence, and, thus, posed a potential safety threat to Defendant Graham. However, Plaintiff was not actively resisting or attempting to evade arrest.

Next, the Court considers whether the force used was reasonable in relation to the need for force. In *Durruthy v. Pastor*, 351 F.3d 1080, 1985 (11th Cir. 2003), Mr. Durruthy brought an action against his arresting officer and others alleging that the officer used excessive force when arresting him for resisting, obstructing, or opposing an officer in violation of Florida Statute § 843.02. Prior to his arrest, Durruthy, a freelance cameraman, was filming a chaotic protest. *Id*. While the police cleared the demonstrators from the street, they arrested another cameraman, Mr. Bruce Berstein. *Id*. Durruthy ran into the street to film the arrest. What followed was captured on videotape:

> While Durruthy was filming Bernstein's arrest in the street, an officer instructed Durruthy to get out of the street. Durruthy backpedaled toward the sidewalk, while continuing to film Bernstein's arrest. As Durruthy approached the sidewalk, Officer Pastor grabbed him from behind. Pastor and another officer then pulled Durruthy onto the ground, while struggling to pin his arms behind him and handcuff him. During the struggle, the other officer also kneed Durruthy in the back. Durruthy stated, "Sir, my arm .. please sir .. I am going peacefully, sir." Pastor held Durruthy down with her hands, while the other

officer tied Durruthy's arms behind his back with flex cuffs.

*Id*. Rejecting the district court's determination that the force applied by Officer Pastor was illegally disproportionate and *no* force was acceptable under these circumstances, the Eleventh Circuit held that this application of force was not excessive under the Fourth Amendment. *Id*. at 1094-1095. The court recognized that even though "the force applied by Pastor in effecting the arrest-forcing Durruthy down to the ground and placing him in handcuffs-was unnecessary, plainly it was not unlawful." *Id*. at 1094. The court reasoned that the force used was de minimus. *Id*. Furthermore, the court reasoned that the force was lawful because Durruthy was not restrained at the time the force was applied. *Id*.

Defendant Graham's use of force was not excessive under the Fourth Amendment. The force used in the instant case was less than the force upheld in *Durruthy*. In both cases, the plaintiffs were unrestrained at the time they pushed to the ground, kneed in the back, and held to the ground. However, Plaintiff was pushed from a squatting position to the ground, whereas Durruthy was forced from a standing position. Also, like in *Durruthy*, Plaintiff was not handcuffed at the time the force was applied. Although Plaintiff emphasizes that an unseen gun was held to her head, there is a critical distinction between displaying and using a gun. *See Hinojosa v. City of Terrell*, 834 F.2d 1223 (5th Cir.1988). In hindsight, like in *Durruthy*, the force applied to Plaintiff was unnecessary, but it was not unlawful.

The Eleventh Circuit and the Middle District of Florida have upheld uses of force that were greater than the use of force in this instance. *See Nolin v. Isbell*, 207 F.3d 1253, 1257

(11th Cir.2000) (finding force to be de minimis where an officer grabbed the plaintiff "from behind by the shoulder and wrist, threw him against a van three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him"); *see also Jones v. City of Dothan*, 121 F.3d 1456, 1460 (11th Cir.1997) (finding the actual force used and injury inflicted were minor in nature where officers "slammed [plaintiff] against the wall, kicked his legs apart, required him to raise his arms above his head, and pulled his wallet from his pants," causing pain in plaintiffs arthritic knee). In *Lau v. Miller*, Slip Copy, 1999 WL 34803669 (M.D.Fla.), the Middle District granted summary judgment despite allegations that deputy defendants grabbed plaintiff in a choke-hold and sprayed chemical agents directly into his eyes causing the plaintiff to have suffered severe physical pain, mental anguish, and permanent facial scarring as a result of the "unreasonable and excessive physical and chemical force utilized."

There is also no dispute that Plaintiff suffered from numerous ailments before the incident on August 20, 2004. "What would ordinarily be considered reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition *the extent of which* was unknown to the officer at the time." *Rodriguez v. Farrell*, 280 F.3d 1341, 1353 (11th Cir.2002) (emphasis added). In *Rodriguez*, the facts, viewed in the light most favorable to the plaintiff, showed:

> Sgt. Farrell grabbed plaintiff's arm, twisted it around plaintiff's back, jerking it up high to the shoulder and then handcuffed plaintiff as plaintiff fell to his knees screaming that Farrell was hurting him. Plaintiff was placed in the rear of Sgt. Farrell's patrol car, kept handcuffed behind his back and transported to

the police station. The handcuffs were removed minutes after arrival at the police department.

*Id.* at 1351. Rodriguez admitted that he did not tell Sgt. Farrell that he had an injured arm, and nothing outwardly indicated that his arm was injured.[8]  *Id.* at 1353. Rodriguez's arm below the elbow was amputated as a result of the incident.  *Id.* 1351.  Reasoning that courts do not use hindsight to judge the acts of police, the Eleventh Circuit concluded that Sgt. Farrell's acts did not constitute a constitutional violation.  *Id.*

The Eleventh Circuit reached an opposite conclusion in *Davis v. Williams*, 451 F.3d 759 (11th Cir. 2006).  The following occurred in *Davis*:

> [Officer Becht] grabbed Davis from behind, twisted his arms behind his back and handcuffed him. Davis tried to tell Becht that he had an injured shoulder and was in pain. Becht's response was to push his arm "hard way up," causing greater pain. Davis was then handcuffed, and forced to the ground by Becht pushing on his bad shoulder.
>
> Becht dragged Davis to the police car, which was a canine unit, and forced him down on the ground again, while pulling hard on his shoulder. In the meantime, Bright pulled the police dog out of its cage in the back of the unit and Becht dragged, pushed or threw Davis very hard into the dog cage causing him to hit his head on the top of the car as he entered. Still handcuffed, Davis slid across the bottom of the cage, hit his head and shoulder on the opposite side of the cage and had to lie down on the metal floor of the cage. Davis was then driven in the cage, not to the police station, but to a nearby parking lot to wait for another vehicle to transport him to the police station.

---

[8] Rodriguez argued that Sgt. Farrell knew or should have known that his arm was injured because, before Sgt. Farrell arrested him: "1) Rodriguez told Sgt. Farrell that he had just gotten out of the hospital because he (Rodriguez) had been in a motorcycle accident; (2) Sgt. Farrell briefly looked through Rodriguez's hospital records; and, (3) Sgt. Farrell was standing behind Ms. Foulkes's car when Rodriguez was in the car and still had his arm in a sling." *Rodriguez*, 280 F.3d at 1353.  The court rejected this argument reasoning that Sgt. Farrell directly testified that that he did not see Rodriguez's arm in a sling.  *Id.*  Further the court reasoned that Rodriguez impermissibly "relies on conjecture that the sling could have, and would have, been observed by a reasonable officer. *Id.*  "An inference is not reasonable if it is 'only a guess or a possibility,' for such an inference is not based on the evidence but is pure conjecture and speculation." *Id.* (*quoting Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir.1982)).

*Id.* at 763-764. In reversing summary judgment in favor of officer Becht on Davis's excessive force claim, the court distinguished its facts from those in *Rodriquez*. The court distinguished that, (1) Davis claimed to have informed the officer almost immediately that he had a bad shoulder; (2) the officer is accused of intentionally focusing on the sore shoulder as to inflict further pain; and (3) there were at "least three incidents of Becht intentionally grabbing, pushing, or pulling Davis' shoulder-after he was handcuffed and after Davis informed Becht that he had a sore shoulder-and forcing him to the ground by intentionally applying stress to the shoulder." *Id.* at 767-768.

The facts of the instant case are more similar to those in *Rodriquez* than in *Davis*. First, although Plaintiff told Defendant Graham that she had arthritis, Defendant Graham did not know the *extent* of her existing medical conditions. Like in *Rodriguez*, the Plaintiff merely assumes that Defendant Graham heard Plaintiff's conversation with Postal Inspector Crockett, but there is nothing in the record to support this contention. Further, like in *Rodriguez*, there is direct evidence that Defendant Graham was not aware of the extent of Plaintiff's injuries. Defendant Graham stated in her sworn affidavit that, "I did not hear any of Inspector Crockett's conversation with Ms. Croom and had no knowledge or information about Ms. Croom's age, health, physical or medical history." [Dkt. 34]. Second, unlike *Davis*, there is nothing in the record to indicate that Defendant Graham intentionally sought to inflict further pain upon the Plaintiff. Third, like in *Rodriguez* and unlike in *Davis*, the entire incident was a single event in which Defendant Graham placed her hand on Plaintiff's

back, pushed Plaintiff forward, and placed her foot on Plaintiff's back. Under the circumstances of this case, the force used to detain Plaintiff was de minimus, non-excessive under the Fourth Amendment. Because the Court finds no constitutional violation, the Court need not address whether the constitutional right at issue was clearly established.

## II.  Remaining Claims

Because the court found no constitutional violation, the court need not consider Plaintiff's claims against Sheriff Balkwill. *See Best v. Cobb County*, 239 Fed. Appx. 501 (11th Cir.2007) (per curiam) (where no constitutional violation, plaintiffs' claim against county cannot survive summary judgment). For the same reason, the court declines to exercise supplemental jurisdiction over Plaintiff's state law claims. *See* 28 U.S.C. § 1367(c)(3).

## III.  Conclusion

Accordingly, it is **ORDERED** that Defendants, Sheriff William F. Balkwill and Frank Bybee's Motion for Partial Summary Judgment as to Counts V and XIV [Dkt. 22] be **GRANTED**; the remaining state counts are dismissed; that Defendant Stephanie Graham's Dispositive Motion for Partial Summary Judgment and Dismissal of State Claims [Dkt. 29] be **GRANTED**; that Defendant's, Clifford Legg, Motion for Summary Judgment as to Count IX [Dkt. 31] be **GRANTED**; the remaining state counts are dismissed; and that Plaintiff's Motion to Strike Affidavit [Dkt. 50] be **DENIED**. The Clerk of Court is directed to enter Judgment for all Defendants and against the Plaintiff and to close this case.

**DONE AND ORDERED** in Chambers in Tampa, Florida, this 18th day of November, 2009.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE